**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| ANDREW TYLER FOSTER, et al, | Case No.6:15-cv-03519-BCW |
| Plaintiffs, | Consolidated with: |
| vs. | Case No. 4:16-cv-00095-BCW |
| L-3 COMMUNICATIONS EOTECH, INC. et al, | Case No. 6:16-cv-03109-BCW |
| | Case No. 4:16-cv-00438-BCW |
| | Case No. 4:16-cv-00439-BCW |
| Defendants. | Hon. Brian C. Wimes |

<u>**DECLARATION OF TIM DOLLAR IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT, CLASS CERTIFICATION, AND AWARD OF ATTORNEYS' FEES, EXPENSES AND SERVICE AWARDS**</u>

I, Tim Dollar, declare the following under penalty of perjury:

1.      I am a member of the firm of Dollar, Burns & Beck, L.C., and amongst those appointed by this Court as Interim Lead Counsel and Class Counsel in this action.  The Court appointed me chair of the plaintiffs' leadership committee.  I am fully familiar with the facts of this case.

2.      I respectfully submit this Declaration on behalf of Plaintiffs and their counsel in support of Plaintiffs' Motion for Final Approval of the Settlement, Class Certification, and Award of Attorneys' Fees, Expenses and Service Awards.  I have personal knowledge of the facts stated herein.

**I.      <u>HISTORY OF THE CASE</u>**

3.      On December 4, 2015, Plaintiff Andrew Tyler Foster filed the first action, *Foster et al. v. L-3 Communications EOTech, Inc. et al.*, Case No. 6:15-cv-03519, in the Western District of Missouri (the "*Foster* Action").

4.      Plaintiff Jerry Chen filed the second action, *Chen v. L-3 Communications EOTech, Inc.*, Case No. 4:15-cv-02308-CL, in the District of Oregon on December 10, 2015 (the "*Chen* Action").

5.      On February 4, 2016, Plaintiffs Jesse Rolfes and Jason Brooks filed the third action, *Rolfes et al. v. L-3 Communications EOTech, Inc.*, Case No. 4:16-cv-00095, in the Western District of Missouri (the "*Rolfes* Action").

6.      On February 5, 2016, counsel for the *Rolfes* Action moved to transfer the action to the Southern Division of the Western District of Missouri where the *Foster* action was pending.

7.      On February 8, 2016, Defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure in the *Foster* Action.

8.      On March 17, 2016, the parties in the *Chen* Action jointly moved to transfer the Action to the Western District of Missouri pursuant to 28 U.S.C. § 1404(a).

9.      On March 18, 2016, the Court consolidated the *Rolfes* and *Foster* Actions.  The *Chen* Action was transferred from the District of Oregon to the Western District of Missouri the same day.

10.     Also on March 18, 2017, the Court denied Defendant's motion to dismiss in the *Foster* Action.

11.     On March 22, 2016, two other actions, *Braginton v. L-3 Communications EOTech, Inc.*, Case No. 16-cv-11053 (the "*Braginton* Action") and *Pittman v. L-3 Communications EOTech Inc.*, Case No. 16-cv-11051 (the "*Pittman* Action"), were filed in the Eastern District of Michigan.

12.     On April 1, 2016, this Court consolidated the *Chen* Action with *Rolfes* and *Foster* and designated the *Foster* Action as the lead case.

13.     On April 4, 2016, plaintiffs in the *Braginton* Action filed a motion with the Judicial Panel on Multidistrict Litigation to transfer *Foster*, *Rolfes* and *Chen* to the Eastern District of Michigan pursuant to 27 U.S.C. § 1407.

14.     Counsel in the *Braginton* and the *Pittman* actions subsequently agreed to coordinate with counsel in the *Foster*, *Chen*, and *Rolfes* actions rather than pursue their motion to transfer and consolidate the actions through the MDL Panel.  An order deeming the motion withdrawn was filed with the Eastern District of Michigan on May 5, 2016

15.     On May 10, 2016, plaintiffs in the *Braginton* and *Pittman* actions filed a notice of voluntary dismissal in the Eastern District of Michigan.

16.     On May 16, 2016, the *Braginton* and *Pittman* actions were filed in the Western District of Missouri.

17.     On August 26, 2016, consolidated the *Braginton* and *Pittman* actions with *Foster*, *Rolfes* and *Chen* and designated the *Foster* Action as the lead case

18.     This action is based on Defendant's marketing and sale of defective holographic gun sights. Plaintiffs have alleged that Defendant's marketing was deceptive in that the sights do not perform as Defendant advertised and that Defendant concealed the defects from its customers. The alleged defects include (1) thermal drift, (2) reticle fade, (3) moisture incursion, and (4) parallax.  Defendant has denied the existence of these alleged defects and has denied liability.

19.     Prior to filing suit, counsel conducted independent investigations into the merits of a class claim against Defendant.  This included but was not limited to communication with witnesses to the development and marketing of the EOTech holographic weapon sights, testing of the holographic weapon sights, interviews with a consulting expert and class members, information available in  *United States* v. *L-3 Communications EOTech, Inc.*, et al., 1:15-cv-09262,

(S.D.N.Y.), historical research into representations made by Defendant to consumers, EOTech's knowledge of the products' defects, and scientific analysis of the functionality of the holographic weapon sights.

20.     Plaintiffs filed a consolidated complaint on September 19, 2016. This complaint contains five counts, which include: (1) violation of the Magnuson-Moss Warranty Act; (2) breach of express warranty; (3) breach of implied warranty; (4) unjust enrichment; and (5) violation of the various states' consumer protection statutes.

21.     On October 3, 2016, the Court appointed attorneys from each of the three plaintiffs' groups as co-interim lead counsel for the class.

## II.    <u>MEDIATION</u>

22.     With the Court's approval, the parties participated in mediation.  The parties engaged Rodney A. Max to serve as mediator.  Mr. Max is a highly-respected mediator with vast mediation experience.  Mr. Max has served as mediator in more than 5,000 mediations, including numerous state and federal mass and class actions.  For example, Mr. Max mediated various claims in the Deepwater Horizon oil spill case, and claims arising out of the 2008 Kingston coal ash spill, the nation's worst coal ash spill in history.  Additional detail concerning the qualifications of Mr. Max are included in the Declaration of Rodney A. Max dated May 17, 2017 ("Max Decl.") ¶¶ 3-9.

23.     The parties spent considerable time and effort to prepare for the mediation, including multiple telephone conferences with the mediator.  Plaintiffs' counsel held an in-person conference with Mr. Max in Atlanta, Georgia at which they presented their mediation statement. In addition, Plaintiffs' counsel thoroughly researched the merits of Plaintiffs' claims as well as Defendant's defenses.  The information and evidence gathered through Plaintiffs' counsel's

investigation and discovery efforts put counsel in an excellent position to accurately assess the strengths and weakness of the parties' claims and defenses.

24. The mediation occurred in four different in-person meetings over several months. Mediation sessions took place in New York City, St. Louis, Virginia, and Washington D.C.

25. At the first mediation on August 12, 2016 in New York, participants on behalf of Defendant included attorneys Richard Godfrey and Andrew Langan and Kathleen E. Karelis, Defendant's corporate representative. Members of the Plaintiffs' leadership committee, including Sharon Almonrode, Bonner Walsh, Adam Gonnelli, Craig Heidemann, Nathan Duncan, Nadeem Faruqi, and myself also attended and participated in the mediation session. Mediation began at 9:30 a.m. and continued until after 10:00 p.m. At this contentious mediation session, the parties spent the majority of the day addressing factual and legal issues. Plaintiffs requested that Defendant provide additional information and discovery to assist in the evaluation of the arguments put forth and to aid future settlement discussions. Defendant took Plaintiffs' requests under consideration. Plaintiffs' counsel ended the mediation session with little optimism that the case could be settled.

26. The parties reconvened the mediation in St. Louis, Missouri on September 9, 2016. That mediation began at 9:30 a.m. and concluded at approximately 7:00 p.m. In attendance for Plaintiffs were myself, Adam Gonnelli, Bonner Walsh, Nathan Duncan, and Sharon Almonrode. For Defendant, Richard Godfrey, W. Jay DeVecchio, and Ms. Karelis again attended. In St. Louis, the parties made some progress toward resolution by discussing a possible settlement structure. There was additional discussion about amounts Defendant might pay in connection with a settlement. However, the parties did not reach agreement on these issues.

27.     At the next mediation, which occurred on Saturday September 24, 2016, in McLean, Virginia, the parties continued discussion of the specific benefits that might be paid to class members.  Again, all attorneys from the Plaintiffs leadership team personally attended the mediation.  For Defendant, W. Jay DeVecchio and Ms. Karelis also participated in the mediation in person.  Counsel used the general model discussed at the St. Louis mediation to structure class benefits.  After another full day of negotiation, the parties reached preliminary agreement on the structure of the settlement and class benefits to be paid by Defendant.

28.     Before reaching a settlement, Defendant produced nearly 50,000 pages of documents.  These documents included data compilations, in-house presentations, emails both internal and external, specifications on the Holographic Weapons sights, information on distribution and sales of Holographic Weapons sights, internal information concerning multiple sight issues, and large amounts of confidential documents pertinent to this litigation.

29.     Over the next few months, through multiple telephone conferences and Mr. Max's assistance, the parties negotiated the details of class members' benefits, the notice program, and claims administration.  At this time, the relief to the Class was agreed to, and the benefits for class members finalized.

30.     In late October, the parties also began to discuss attorneys' fees, reimbursement of expenses, and service awards to the Named Plaintiffs.  In addition, the parties began to draft settlement documents.  The drafting process was often painstaking and required continued negotiation and multiple conferences with counsel for Defendant to resolve disagreements.

31.     On February 2, 2017, the parties and Mr. Max met in Washington, D.C. to negotiate final terms in the implementation of the draft settlement agreement.  In attendance for Plaintiffs were myself, Nadeem Faruqi, Adam Gonnelli, Bonner Walsh, Nathan Duncan, Craig Heidemann,

and Sharon Almonrode. For Defendant, David F. McDowell, and W. Jay DeVecchio attended. Among many other things, counsel negotiated details of the class definitions and details of the notice program including the contents of banner and publication ads. Despite reaching an agreement in principle, serious issues remained. As with the three prior mediation sessions, counsel worked through a full day negotiating final terms. The mediation session ended with agreement on the majority of the outstanding issues including attorneys' fees and service awards. All remaining issues were resolved between the parties during subsequent telephone and written communication.

32.     Throughout the lengthy negotiation and mediation process, counsel for the parties heatedly debated the merits of the action and the structure and substance of the settlement. All phases of the negotiations were conducted at arm's length. The process was quite contentious, and broke down several times over key issues. Although the parties left mediation sessions several times without a settlement, Mr. Max continued to serve as the intermediary of the parties via telephone.

33.     The first three mediation sessions were devoted exclusively to detailed discussion of the factual and legal merits of the case, the structure of the class settlement, the specific class benefits provided by the settlement, and the notice program.

34.     Only after the parties reached agreement on class relief did the parties discuss and reach agreement on Defendant's payment of legal fees and service awards to the Named Plaintiffs ($10,000,000.00), which would be paid outside of the funds paid to class. The parties reached this agreement during a series of telephone conferences with Mr. Max and at the final mediation session in Washington, D.C.

7

35.     Even after final mediation session in Washington, D.C., the parties negotiated issues concerning notice and claims administration.  In mid-February 2017, the parties signed the operative settlement documents and Plaintiffs filed their unopposed motion for preliminary approval of the settlement on February 13, 2017.  The Court granted that motion on February 15, 2017, which allowed the parties to promptly begin the notice program outlined in the Settlement Agreement.

36.     Based upon the documents produced by Defendant and the investigation and evaluation of the facts and law relating to all of the matters alleged in the pleadings, the parties agreed to settle the action under the terms of the Settlement Agreement after considering, among other things: (i) the substantial and immediate benefits available to plaintiffs and the Settlement Class; (ii) the attendant risks and uncertainty of litigation, especially in complex actions such as this; (iii) the difficulties and delays inherent in such litigation; and (iv) the desirability of consummating a settlement promptly to provide effective relief to plaintiffs and the settlement class.

37.     While Plaintiffs and their counsel strongly believe in the merits of the cases, Plaintiffs would have faced a number of risks and significant expense if the litigation had continued.  The next step in litigation would have been an expensive, time consuming and undoubtedly contentious discovery process.  Following discovery, Plaintiffs would have brought motions for class certification and possibly summary judgment, both of which would have been assisted by expert testimony.  These motions, which counsel had begun work on, would have been complicated and hotly contested.  Both motions would have involved *Daubert* motions on expert testimony and probably live evidentiary hearings.  The class certification motion would have involved the analysis of complex choice of law issues and potential subclasses.  Cross summary

8

judgment motions would have required analysis of complex factual and technical issues. In addition, Defendant would have undoubtedly sought appeals of favorable rulings. Further, if the litigation was not disposed of by summary adjudication, a trial on the merits would have posed its own risks, including the prospect of an appeal of a favorable verdict.

38. The settlement avoids the risk and potentially years of delay continued litigation would have posed and simultaneously provides benefits for Plaintiffs and the Settlement Class that are immediate, certain and substantial.

39. The proposed Settlement allows Settlement Class Members to choose between the return of the Sight for a full refund or keeping the Sight and receiving other compensation[1].

40. As a result of this litigation, as of May 12, 2017, more than approximately 78,300 Sights have been returned. According to data provided by class members at this time the average cost of returned sights is $651.67, thus the approximate value of the returns so far is $51,025,761.00.

41. The deadline for claims is not until May 23, 2017, so this amount will likely increase.

42. Pursuant to the terms of the settlement, the parties retained the Heffler Claims Group, a well-recognized and respected claims administrator, to oversee the notice and claims process. Following execution of the settlement agreement and preliminary approval, a robust notice program ensued. Notice was distributed in a variety of forms including print publication, websites, e-newsletters, gun-related forums, digital magazine, banner ads, and social media. The notice program was successful in its reach and well-tailored to reach the maximum number of class

---

[1] Class members who keep their sights have the option of a cash payment of up to $50.00 or a voucher for a $100.00 discount off the purchase of another EOTech product.

members possible. The execution of the notice program is described in detail in the Declaration of Jeanne C. Finegan Concerning Implementation and Adequacy of Notice Program dated May 18, 2017. Ms. Finegan is the President and Chief Media Officer of HF Media, LLC at the Heffler Claims Group.

43.     The total class members electing to participate in the settlement is sufficiently numerous to justify approval of the settlement. As a result of Plaintiffs' efforts, over 80,000 individuals will receive class benefits.

44.     The Named Plaintiffs are representative of all class members in that Plaintiffs purchased and own holographic weapon sights with the same defects as those alleged in the complaint. The legal and factual questions affecting Plaintiffs' claims against Defendant are identical to those of all other class members. Plaintiffs have fairly and adequately represented the class's interests. No conflicts of interest exist between Plaintiffs and class members. Plaintiffs' interests squarely align with those of the class.

45.     Additionally, Plaintiffs retained legal counsel experienced in consumer class action litigation. Class counsel fairly represented the class's interests throughout the case and worked diligently to obtain a fair settlement for the class. *See* Declarations of Adam Gonnelli, Nadeem Faruqi, Bonner C. Walsh, Tim Dollar, Sharon Almonrode, and Craig R. Heidemann.

## III.     PLAINTIFF COUNSEL'S LODESTAR AND EXPENSES

46.     Plaintiffs' counsel has not received any payment throughout this litigation, which began in 2015.

47.     The hours worked and the lodestar fee and expenses for each of the firms representing the Settlement Class are set forth in the attorney declarations, submitted herewith. They can be summarized as follows:

10

| Summary of Plaintiffs' Counsel's Time and Lodestar | | | |
|---|---|---|---|
| Firm | Hours | Lodestar | Expenses |
| | | | |
| Dollar, Burns & Becker, L.C. | 499 | $307,850.00 | $11,792.54 |
| Douglas, Haun & Heidemann, P.C. | 1,651.71 | $937,076.50 | $26,774.21 |
| Faruqi & Faruqi, LLP | 1,335.28 | $713,692.00 | $29,618.37 |
| Miller Law Firm | 1,249.05 | $778,879.00 | $21,963.98 |
| The Sultzer Law Group, P.C. | 219.5 | $196,452.50 | $13,696.51 |
| Walsh, LLC | 539.91 | $323,945.17 | $9,534.03 |
| | | | |
| **Total** | 5,494.45 | $3,257,895.17 | $86,605.43 |

48.     The combined lodestar for Plaintiffs' counsel is $3,257,895.17. Counsel has incurred $86,605.43 in unreimbursed expenses and billed 5,494.45 contingency fee hours on this case, excluding any work that will take place after the filing of this motion.

49.     In addition to the time enumerated above, Plaintiffs' counsel will incur additional time and expenses in connection with the fairness hearing, coordinating with the settlement administrator, monitoring settlement administration, and responding to Settlement Class Members' inquiries.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 19th day of May, 2017.

Tim Dollar